DiBENEDETTO v WEST SHORE HOSPITAL

Docket No. 112083. Argued October 12, 1999 (Calendar No. 11). Decided February 9, 2000.

Margaret DiBenedetto suffered a work-related injury, for which her employer voluntarily paid worker's compensation benefits. More than two years after her injury, a magistrate awarded plaintiff increased benefits under MCL 418.356(1); MSA 17.237(356)(1). The Second Injury Fund, which was responsible for paying the increased benefit amount, appealed to the Worker's Compensation Appellate Commission, which affirmed the magistrate's decision. After the plaintiff gained subsequent employment, the fund petitioned for termination of plaintiff's wage loss benefits under MCL 418.301(5)(c); MSA 17.237(301)(5)(c), arguing that she earned more from her subsequent employment than the average weekly wage she received before the date of her injury. A magistrate denied the petition, concluding that the plaintiff's average weekly wage had been revised by the award of increased benefits under subsection 356(1), and that her wage loss benefits should be determined by comparing her earnings from subsequent employment to her revised average weekly wage. The fund appealed to the WCAC, arguing that the plain language of subsection 301(5)(c) required termination of the plaintiff's wage loss benefits for the duration of her subsequent employment. The WCAC agreed, holding that when an employee is involved in subsequent work, the offset is to be determined using the wage the employee received before the date of the injury. Thus, because, under subsection 301(5)(c) the average weekly wage is more than the plaintiff received before the date of her injury, she is not entitled to any benefits for the duration of her employment. The Court of Appeals, FITZGERALD, P.J., and HOOD and SAWYER, JJ., reversed, holding that when an employee successfully obtains an adjustment in compensation pursuant to subsection 356(1) by demonstrating that a greater wage would have been earned but for the injury, the imputed higher wage should be substituted for the preinjury wage when applying subsection 301(5). 229 Mich App 223 (1998) (Docket No. 200754). The Second Injury Fund appeals.

In an opinion by Justice MARKMAN, joined by Chief Justice WEAVER, and Justices TAYLOR, CORRIGAN, and YOUNG, the Supreme Court *held*:

On the basis of the plain and unambiguous language of MCL 418.301(5)(c); MSA 17.237(301)(5)(c), the Court of Appeals erred as a matter of law when it substituted the imputed higher wage awarded the plaintiff under subsection 356(1) for the average weekly wage that the plaintiff received before the date of injury.

1. There was no error in the WCAC's interpretation of subsections 356(1) and 301(5)(c). The plain language of subsection 301(5)(c) requires a magistrate to compare the average weekly wage of an employee from subsequent employment with the average weekly wage the employee received before the date of injury. This language is unambiguous, and does not permit the magistrate to consider increased benefits a plaintiff may have been awarded more than two years after injury under subsection 356(1). A plain reading of the statutory language is susceptible of only one meaning.

2. Applying the plain statutory language of subsection 301(5)(c) would not produce an absurd and unjust result. There is nothing absurd or unjust about the statutory distinction between injured employees who are able to work postinjury and those who are unable to do so. When an injured employee gains subsequent employment and earns as much or more than was earned before the date of injury, there has been no compensable wage loss. Subsection 301(5)(c) treats recipients of subsection 356(1) enhanced benefits no differently than all other classes of injured employees. In this case, the plaintiff's average weekly wage from subsequent employment was far in excess of the average weekly wage she was earning before the date of her injury, and her benefits were properly terminated for the duration of subsequent employment.

3. Nor would application of the plain language of subsection 301(5)(c) be clearly inconsistent with the purposes and policies of the worker's compensation act. An injured employee is entitled to worker's compensation benefits only if the work-related injury resulted in a wage loss. The plain language of subsection 301(5)(c) effects the general purposes and policies of the act by terminating wage loss benefits for injured employees who cease to suffer a compensable wage loss.

Reversed.

Justice CAVANAGH, joined by Justice KELLY, dissenting, stated that subsection 301(5)(c) must be construed in consolidation with subsection 356(1). When so read, it becomes clear that a literal interpretation of subsection 301(5)(c) would render subsection 356(1) meaningless by disqualifying persons from receiving subsection

356(1) benefits once they return to the same job or have earning capacity equivalent to the wages they earned at the time of injury. The purpose of subsection 356(1) is to alleviate the inequities that may result when an employee is injured at a job paying much less than the employee would be able to command in the marketplace or would soon be able to command because of education, training, and so forth. Once a rate adjustment has been made on the basis that a particular person would be earning more money because of education or experience, it would be illogical to return that employee to the prior rate of pay. The statute, when viewed as a whole, contemplates a rate increase based on earnings an employee would have made but for the injuries. The Court of Appeals read subsection 301(5)(c) in conjunction with subsection 356(1) and found incongruity. In response, it considered legislative intent, and arrived at a logical interpretation.

*Frederick W. Bleakley* for the plaintiff-appellee.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Rose A. Houk*, Assistant Attorney General, for the defendant-appellant.

MARKMAN, J. In this case, we must decide whether the Worker's Compensation Appellate Commission (WCAC) properly analyzed two statutory provisions of the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.* The first provision allows an injured employee the opportunity to request an increased benefit rate after two years of continuous disability if the employee's earnings would have been expected to increase because of certain enumerated factors. MCL 418.356(1); MSA 17.237(356)(1). The second provision requires termination of an injured employee's wage loss benefits when the employee's average weekly wage (AWW) from subsequent employment exceeds the AWW the employee received before the date of injury. MCL 418.301(5)(c); MSA 17.237(301)(5)(c).

The question this Court must resolve is whether subsection 301(5)(c) permits the worker's compensation magistrate to compare an injured employee's AWW from subsequent employment to the AWW imputed to the injured employee under subsection 356(1) more than two years after the date of injury. This question is clearly resolved by the plain language of subsection 301(5)(c), which requires the magistrate to compare the "average weekly wage of the employee" from subsequent employment with the "average weekly wage the employee received *before the date of injury.*" MCL 418.301(5)(c); MSA 17.237(301)(5)(c) (emphasis added). The language "before the date of injury" precludes comparison between an injured employee's AWW from subsequent employment and the AWW imputed to the employee under subsection 356(1) more than two years after the date of the injury. We therefore reverse the decision of the Court of Appeals and reinstate the order of the WCAC.

On August 26, 1986, plaintiff Margaret DiBenedetto was injured in the course of her part-time employment as a licensed practical nurse at West Shore Hospital. Plaintiff's employer voluntarily paid her worker's compensation benefits at a rate of $108.12 a week. On May 17, 1989, more than two years after her injury, plaintiff requested an increased benefit rate under subsection 356(1) of the WDCA. MCL 418.356(1); MSA 17.237(356)(1) provides, in pertinent part:

> An injured employee who, at the time of the personal injury, is entitled to a rate of compensation less than 50% of the then applicable state average weekly wage as determined for the year in which the injury occurred pursuant to section 355, may be entitled to an increase in benefits after

2 years of continuous disability. After 2 years of continuous disability, the employee may petition for a hearing at which the employee may present evidence, that by virtue of the employee's age, education, training, experience, or other documented evidence which would fairly reflect the employee's earning capacity, the employee's earnings would have been expected to increase. Upon presentation of this evidence, a worker's compensation magistrate may order an adjustment of the compensation rate up to 50% of the state average weekly wage for the year in which the employee's injury occurred. The adjustment of compensation, if ordered, shall be effective as of the date of the employee's petition for the hearing. . . . There shall be only 1 adjustment made for an employee under this subsection.

The worker's compensation magistrate determined that plaintiff was totally disabled as a result of her work-related injuries and was therefore entitled to benefits. The AWW plaintiff received from her employment in 1986, before the date of her injury, was $141.61. The magistrate determined that plaintiff's AWW would have been expected to increase from $141.61 to $365.38 by the time she filed her 1989 petition, but for her 1986 work-related injury. Applying subsection 356(1), the magistrate awarded plaintiff benefits at fifty percent of the 1986 state AWW, $207.35. Defendant Second Injury Fund (SIF), which was responsible for paying the increased benefit amount to plaintiff, appealed to the WCAC, which affirmed the magistrate's decision.

Plaintiff subsequently returned to work at West Shore Hospital, although not in her skilled employment as a licensed practical nurse. She worked a part-time schedule until late 1990 or early 1991, when she began full-time work. Her weekly wage from this employment fluctuated between $250 and $370. In March 1993, the SIF petitioned for termination of

plaintiff's wage loss benefits under subsection 301(5)(c), arguing that plaintiff earned more from her subsequent employment than the AWW she received before the date of her injury. MCL 418.301(5)(c); MSA 17.237(301)(5)(c) provides, in pertinent part:

> If disability is established pursuant to subsection (4), entitlement to weekly wage loss benefits shall be determined pursuant to this section and as follows:
>
> *          *          *
>
> (c) If an employee is employed and the average weekly wage of the employee is equal to or more than the average weekly wage the employee received before the date of injury, the employee is not entitled to any wage loss benefits under this act for the duration of such employment.

The worker's compensation magistrate denied the SIF's petition to terminate benefits, concluding that plaintiff's AWW had been revised by the subsection 356(1) award and that her wage loss benefits should be determined by comparing her earnings from subsequent employment to her revised AWW. The SIF appealed to the WCAC, arguing that the decision to terminate wage loss benefits under subsection 301(5)(c) requires a comparison between the injured employee's AWW received from her subsequent employment and the AWW she "received before the date of injury." Under this construction, the amount plaintiff earned from her subsequent employment, between $250 and $370 a week, would be compared to the AWW she received before her 1986 injury, $141.61. The SIF argued that, given this comparison, the plain language of subsection 301(5)(c) provides that plaintiff would not be entitled to any additional wage loss bene-

fits for the duration of such employment.

The WCAC agreed with the SIF's position, holding as follows:

> Both of those sections are very explicit. When an employee is involved in subsequent work, the offset is to be determined using the wage the employee received before the date of the injury. In this case, that was $141.00 a week. Thus, under Section 301(5)(c), since the average weekly wage is more than plaintiff received *before the date of her injury*, she is not entitled to any benefits for the duration of her employment. The Magistrate's conclusion of law is corrected[,] *Abbey v Campbell, Wyant & Cannon Foundry* [*On Remand*], 194 Mich App 341, 351 [468 NW2d 131] (1992), his decision is reversed, and the Fund's Petition to Stop [benefits] is granted. [1997 Mich ACO 6, 10 (emphasis in original).]

Plaintiff sought leave to appeal in the Court of Appeals, arguing that the worker's compensation magistrate properly compared the AWW that plaintiff received from her subsequent employment to the AWW imputed to her more than two years after the date of her injury under subsection 356(1), $365.38. Under this construction, subsection 301(5)(c) would eliminate plaintiff's wage loss benefits only when her AWW received from subsequent employment exceeded $365.38. The Court of Appeals reversed the decision of the WCAC and agreed with plaintiff's position, holding as follows:

> We agree with plaintiff that the Legislature *cannot* have intended § 301(5)(c) to be applied as it has been in this case in light of the legislative decision embodied in § 356(1). That section allows a disabled employee under certain circumstances to prove that, but for her injury and disability, she would be earning a greater wage than she was earning at the time of the injury. Presumably this sec-

tion is meant to alleviate the inequities that may result when an employee is injured at a job paying much less than the employee would be able to command in the marketplace or would soon be able to command because of education, training, and so forth. A person might work part-time, like plaintiff, for a variety of reasons, but might have expected to work full-time and received much greater compensation in the near future. If the WCAC's interpretation of § 301(5)(c) were correct, then the purpose underlying § 356(1) would be defeated. Even if plaintiff earns only $142 a week, she would lose all benefits because her present weekly wage would exceed the weekly wage she earned at the time of her injury by thirty-nine cents. Moreover, if plaintiff were to refuse the offer of a job paying $142 a week, she would forfeit her right to benefits pursuant to § 301(5)(a).

In order to avoid this illogical result and to give effect to both sections, we hold that, when an employee successfully obtains an adjustment in compensation pursuant to § 356(1), by demonstrating that the employee would have earned a greater wage but for the injury, the imputed higher wage should be substituted for the preinjury wage when applying § 301(5). An injured employee will thereby receive the benefit of § 356(1) while unemployed, will receive no benefits if wages from favored work exceed the augmented wage rate, and will receive eighty percent of the difference up to the statutory maximum if the favored work pays less than the augmented wage rate. [229 Mich App 223, 228-229; 581 NW2d 766 (1998) (emphasis in original).]

We granted the SIF's application for leave to appeal.

This Court reviews questions of law involved in any final order of the WCAC under a de novo standard of review. *Oxley v Dep't of Military Affairs*, 460 Mich 536, 540-541; 597 NW2d 89 (1999). Findings of fact made or adopted by the WCAC within the scope of its powers are conclusive on appeal, in the absence of fraud, but a decision of the WCAC is subject to reversal if it is based on erroneous legal reasoning or the

wrong legal framework. MCL 418.861a(14); MSA 17.237(861a)(14); *Goff v Bil-Mar Foods, Inc (After Remand)*, 454 Mich 507, 512; 563 NW2d 214 (1997); *Taylor v Second Injury Fund*, 234 Mich App 1, 13; 592 NW2d 103 (1999).

When reviewing questions of statutory construction, our purpose is to discern and give effect to the Legislature's intent. *Murphy v Michigan Bell Telephone Co*, 447 Mich 93, 98; 523 NW2d 310 (1994). We begin by examining the plain language of the statute. Where that language is unambiguous, we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written. *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 135; 545 NW2d 642 (1996). We must give the words of a statute their plain and ordinary meaning, and only where the statutory language is ambiguous may we look outside the statute to ascertain the Legislature's intent. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995).

> The primary goal of judicial interpretation of statutes is to ascertain the intent of the Legislature. The first criterion in determining intent is the specific language of the statute. The Legislature is presumed to have intended the meaning it plainly expressed. If the plain language of the statute is clear, no further judicial interpretation is necessary. [*In re Worker's Compensation Lien (Ramsey v Kohl)*, 231 Mich App 556, 561; 591 NW2d 221 (1998) (internal citations omitted).]

Finally, the WDCA is a remedial statute that should be " 'liberally construed to grant rather than deny benefits.' " *Goff, supra*, 454 Mich 511, quoting *Sobotka*

*v Chrysler Corp (After Remand)*, 447 Mich 1, 20, n 18; 523 NW2d 454 (1994) (opinion of BOYLE, J.).

We find no error in the WCAC's interpretation of subsections 356(1) and 301(5)(c). The plain language of subsection 301(5)(c) requires the magistrate to compare the "average weekly wage of the employee" from her subsequent employment with the "average weekly wage the employee received *before the date of injury*." MCL 418.301(5)(c); MSA 17.237(301)(5)(c) (emphasis added). The plain statutory language is unambiguous, and it does not permit the magistrate to consider the increased benefits a plaintiff may have been awarded more than *two years after her injury* under subsection 356(1). A plain reading of the statutory language at issue is susceptible of only one meaning. The average weekly wage that plaintiff received "before the date of injury" was clearly $141.61, not the subsequent benefit rate of $365.38.

Plaintiff concedes that subsection 301(5)(c) is unambiguous. However, she contends that an ambiguity appears when subsections 301(5)(c) and 356(1) are considered together because the application of subsection 301(5)(c) would eliminate the employee's "entitlement to an enhanced wage" awarded under subsection 356(1). Plaintiff views this as an absurd and unjust result, citing *Salas v Clements*, 399 Mich 103, 109; 247 NW2d 889 (1976), for the proposition that a departure from the rules of literal construction is justified when such construction would produce an absurd and unjust result. The full quotation to which plaintiff refers is as follows:

> [W]e must keep in mind the fundamental rule of statutory construction that departure from the literal construction of a statute is justified when such construction would produce

an absurd and unjust result and would be clearly inconsistent with the purposes and policies of the act in question. [*Id.*]

The dissent likewise believes that applying the plain language of subsection 301(5)(c) would produce an absurd and unjust result because such a construction would give "no effect" to subsection 356(1), and would somehow render that subsection meaningless. The dissent concludes that subsection 301(5)(c) cannot be viewed "in isolation," but must be construed "in consolidation with" subsection 356(1) and that employees who have received a subsection 356(1) wage adjustment after two years of continuous disability must be accorded different treatment under subsection 301(5)(c) than other injured employees. *Post* at 407-408.

We respectfully disagree with both plaintiff and the dissent that applying the plain statutory language of subsection 301(5)(c) would produce an absurd and unjust result. There is nothing absurd or unjust about the statutory distinction between injured employees who are able to work post-injury and those who are unable to do so. When an injured employee gains subsequent employment and earns as much or more than was earned before the date of injury, there has simply been no compensable wage loss. In this case, plaintiff's AWW from subsequent employment was far in excess of the AWW she was earning before the date of her injury, and her benefits were properly terminated for the duration of such subsequent employment.

Subsection 301(5)(c) treats recipients of subsection 356(1) enhanced benefits no differently than all other classes of injured employees. We note that subsection 356(1) was the first of these two statutory provisions

to be enacted by 1980 PA 357, effective January 1, 1982. Subsection 301(5)(c) was enacted by 1981 PA 200, and was also effective January 1, 1982. The Legislature was obviously aware of subsection 356(1) when it drafted subsection 301(5)(c). Nevertheless, the Legislature chose to provide for termination of an injured employee's benefits on the basis of a comparison between earnings from subsequent employment and the AWW "before the date of injury." MCL 418.301(5)(c); MSA 17.237(301)(5)(c). Contrary to the dissent's suggestion, we do not treat subsection 356(1) as though it is irrelevant to plaintiff's case. Rather, we read subsections 301(5)(c) and 356(1) together, and conclude that the Legislature chose not to adopt an exception in subsection 301(5)(c) for injured employees who had received a benefit adjustment under subsection 356(1). Although the dissent feels this is an "illogical" result, we decline to rewrite the plain statutory language and substitute our own policy decisions for those already made by the Legislature.[1]

We further disagree with both plaintiff and the dissent that application of the plain language of subsection 301(5)(c) would be "clearly inconsistent with the purposes and policies" of the WDCA. An injured employee is only entitled to worker's compensation benefits if the work-related injury resulted in a wage

---

[1] The dissent disagrees with our interpretation of subsection 301(5)(c) because that interpretation would disqualify someone from receiving subsection 356(1) benefits once they return to the same job or have earning capacity equivalent to the wages they earned at the time of injury. This is exactly the result required by subsection 301(5)(c)—termination of wage loss benefits when an injured employee's AWW from subsequent employment equals or exceeds the AWW before the date of injury. We believe that the result in this case is compelled by those policy choices made by the Legislature when it enacted subsections 356(1) and 301(5)(c).

loss. *Haske v Transport Leasing, Inc, Indiana,* 455 Mich 628, 642-643; 566 NW2d 896 (1997). As Justice WEAVER explained in her partial concurrence:

> The concept of wage loss is reflected by provisions of the worker's compensation act such as subsection 301(5)(a), which disqualifies an eligible, disabled employee if the employee has refused favored work, and subsection 301(5)(c), which disqualifies an eligible, disabled employee who earns as much or more after the injury as before, for the duration of such earning. Thus, where an employee effectively removes himself from the workforce by refusing favored work or where he earns more than before the injury, the employee is not entitled to benefits because he has effectively suffered no wage loss. [*Id.* at 674-675.]

The plain language of subsection 301(5)(c) effects the general purposes and policies of the WDCA by terminating wage loss benefits for injured employees who cease to suffer a compensable wage loss.

Finally, we disagree with the dissent's conclusion that we have "construe[d] the statute narrowly in favor of the employer, rather than broadly in favor of the employee." *Post* at 408. The plain statutory language of subsection 301(5)(c), which requires the magistrate to consider the AWW the employee received "before the date of injury" simply cannot be read to allow consideration of the AWW imputed to the employee two years after the date of injury, no matter how liberally that language is construed.

On the basis of the plain and unambiguous language of subsection 301(5)(c), we hold that the Court of Appeals erred as a matter of law when it substituted the "imputed higher wage" awarded plaintiff under subsection 356(1) for the average weekly wage that plaintiff received "before the date of injury."

While we are not oblivious to the policy rationale that might well exist in support of the results reached by the Court of Appeals, we nevertheless find that the Legislature, in drafting subsection 301(5)(c) as it did, chose to disregard this rationale. The decision of the Court of Appeals is reversed, and the order of the WCAC is reinstated.

WEAVER, C.J., and TAYLOR, CORRIGAN, and YOUNG, JJ., concurred with MARKMAN, J.

CAVANAGH, J. (*dissenting*). Because I would affirm the decision of the Court of Appeals, I respectfully dissent. The majority concludes:

> The plain statutory language [of subsection 301(5)(c)] is unambiguous, and it does not permit the magistrate to consider the increased benefits a plaintiff may have been awarded more than two years after her injury under subsection 356(1).[1]

Although the majority's textual interpretation may make sense if subsection 301(5)(c) could be viewed in isolation, I believe that subsection 301(5)(c) must be construed in consolidation with subsection 356(1).

The majority treats subsection 356(1) as though it is irrelevant by determining that literal construction principles confine our analysis to the plain language of subsection 301(5)(c). Although the majority opinion makes reference to subsection 356(1), the majority holds that a subsection 356(1) increase will not be factored into subsection 301(5)(c) benefit entitlement. Clearly, the majority holding applies the language of subsection 301(5)(c) alone. Yet, this Court is not con-

---

[1] *Ante*, p 403.

strained to consider subsection 301(5)(c) in isolation. Rather, the Court may depart from strict construction principles when a literal reading of the statute will produce absurd or illogical results, and this Court should attempt to give effect to all relevant statutory provisions. *Gross v General Motors Corp*, 448 Mich 147; 528 NW2d 707 (1995); *In re Landaal*, 273 Mich 248, 252; 262 NW 897 (1935). Moreover, the Worker's Disability Compensation Act (WDCA) is a remedial statute that should be liberally construed in favor of the employee. *Goff v Bil-Mar Foods, Inc (After Remand)*, 454 Mich 507; 563 NW2d 214 (1997). *Sobotka v Chrysler Corp (After Remand)*, 447 Mich 1, 20; 523 NW2d 454 (1994).

The majority's interpretation violates several of the aforementioned principles. The majority gives no effect to subsection 356(1) and reaches a result that is clearly illogical in light of the purposes underlying the WDCA. It further construes the statute narrowly in favor of the employer, rather than broadly in favor of the employee.

I agree with the Court of Appeals that subsection 301(5)(c) must be construed in conjunction with subsection 356(1). When read together, it becomes clear that a literal interpretation of subsection 301(5)(c) would render subsection 356(1) meaningless. A literal reading would disqualify persons from receiving subsection 356(1) benefits once they return to the same job or have earning capacity equivalent to the wages they earned at the time of injury. I disagree with an interpretation of subsection 301(5)(c) that treats employees who have received a subsection 356(1) wage adjustment in the same manner as those who have not received the adjustment. Rather, I agree

with the Court of Appeals that the purpose of subsection 356(1) is to "alleviate the inequities that may result when an employee is injured at a job paying much less than the employee would be able to command in the marketplace or would soon be able to command because of education, training, and so forth." 229 Mich App 223, 228; 581 NW2d 766 (1998). Once a rate adjustment has been made on the basis that a particular person would be earning more money because of education or experience, it would be illogical to return that employee to the prior rate of pay. I believe that the statute, when viewed as a whole, contemplates a rate increase based on earnings the employees would have made but for their injuries. In my view, "legislative intent" is not preserved by limiting our analysis to a strict reading of a single statutory provision, but by giving effect to the sum of relevant statutory parts.

Viewing Michigan's worker's compensation system from an historical perspective, it becomes clear that the Court of Appeals decision was well reasoned. Under the WDCA, injured employees have no right to sue under negligence principles even though they may have lost the ability to work and advance in their fields of choice. MCL 418.131(1); MSA 17.237(131)(1). Subsection 356(1) of the WDCA compensates for lost earning potential in a fashion that helps balance the interests of all parties involved. If subsection 301(5)(c) is read without reference to subsection 356(1), then the equities fall out of alignment.

Under the majority view, employees might be discouraged from returning to work because they could receive higher worker's compensation payments than their salary. Here, DiBenedetto's new salary nearly

mirrors her prior entitlement. Thus, the majority's position may not seem harsh in this instance. On the other hand, had DiBenedetto been making five dollars more than her 1986 salary, she would still be cut off. The difference between her worker's compensation benefits could then be substantial.

I am not persuaded that the Court of Appeals attempted to label the plaintiff's subsection 356(1) adjustment as a preinjury wage. Neither did the Court attempt to squeeze the wage adjustment into the definition provided by subsection 301(5)(c). Rather, I think that the Court of Appeals read subsection 301(5)(c) in conjunction with subsection 356(1) and found incongruity. In response, the Court of Appeals considered legislative intent, and arrived at a logical interpretation.

I would, therefore, affirm the decision of the Court of Appeals.

KELLY, J., concurred with CAVANAGH, J.